IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION, <br><br> Defendant. | Civil Action No. 1:21-cv-1491-CRC |

**DECLARATION OF SARAH UHLEMANN**

I, Sarah Uhlemann, declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts. As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter.

2. I am a senior attorney and international program director for the Center for Biological Diversity (Center), where I have worked since 2010. I am also a member of the Center for Biological Diversity, a Section 501(c)(3) organization under the U.S. tax code. The Center has more than 84,000 members and around 1.7 million activists.

3. In my role as international program for the Center, I oversee the Center's legal advocacy and international diplomacy to protect imperiled wildlife species outside U.S. borders. In this role, I am very familiar with the Center organizationally and its operations, as well as the Center's work on international issues, including our work to reform U.S. finance agencies.

1

4. As part of our international work at the Center, we regularly monitor, track, and comment on both the projects proposed by U.S. federal development and funding agencies such as the former Overseas Private Investment Corporation (OPIC) (the Development Finance Corporation's (DFC) predecessor agency) and the U.S. Export-Import Bank. The Center has been active in monitoring the financing decisions of these agencies over the last decade. Many of the projects financed by these agencies have a significant impact on both the environment and wildlife species.

5. In 2017 and 2018, the Center was involved in the legislative creation of the U.S. Development Finance Corporation (DFC) through the Better Utilization of Investment Leading to Development (BUILD) Act, P.L. 115-254 (2018), including the efforts of five Center staff people. This included meeting with Rep. Maxine Waters (D-CA), Chair of the House of Representatives Financial Services Committee, who was instrumental in the agency's creation.

6. Throughout our participation in the BUILD Act legislative process, there was no discussion of a desire or intention to exempt the new DFC from the Sunshine Act. Had here been such an exemption, we would have strongly opposed.

7. When OPIC was an agency, the Center and its staff relied on Federal Register notices of meetings, minutes of meetings, transcripts of meetings, and records of meetings. This information was vital for our staff to understand what the agency was considering and proposing and our efforts to ensure the agency considered and mitigated biodiversity and wildlife impacts of their decisions. Overall, this information allowed Center staff to monitor the workings of OPIC and participate more effectively in the agency's decision-making process.

8. The Center has submitted comments on several OPIC projects. For example, in 2017 and 2018, the Center and our colleagues submitted detailed comments regarding OPIC's

consideration of financing for the PT. Domas Agrointi Prima (DAP) Oleochemical Project in Medan, Indonesia.  Those comments detailed OPIC's failure to address impacts on critical forests and natural habitat, as well as impacts to endangered species.  In 2019, the Center and our colleagues submitted detailed comments opposing OPIC's support for the Rovuma Liquefied Natural Gas (LNG) project in Cabo Delgado, Mozambique.  The comments detailed the project's impacts to climate change and the sensitive marine habitats in the area, inhabited by several imperiled species of sea turtles and whales.  We also met with OPIC staff to discuss the project, along with our coalition partners.

9. The Center has also commented on projects the U.S. Export-Import Bank has funded, including two LNG projects in Australia's Great Barrier Reef, and reviewed minutes of meetings that agency provided.

10. The Center and its staff have participated in the several "public" meetings offered by DFC since its creation, but many meetings have been private, falling far short of what would be required under the Sunshine Act.  *See* Attachments A and B (notices of closed DFC meetings).

11. The Center will not be able to effectively monitor and learn about what the new DFC agency is doing without the Sunshine Act's requirements, which limits our ability to submit information and advocate regarding our and our members' interests in wildlife and biodiversity affected by DFC-funded projects.

12. For all the reasons so stated, the Center for Biological Diversity, our staff, and our ability to advocate are harmed by the DFC's failure to follow the Sunshine Act and the deprivation of information on DFC's activities and decision-making.  If DFC were ordered to

comply with the Sunshine Act, we would have greater access to and more detailed information about the agency's actions and decisions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 8th, 2021.

*Sarah Uhlemann* (signature)

Sarah Uhlemann