IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES INTERNATIONAL DEVELOPMENT FINANCE CORPORATION,<br><br>          Defendant. | Civil Action No. 1:21-cv-1491-CRC |

**DECLARATION OF CARLA GARCIA ZENDEJAS**

I, Carla García Zendejas, declare as follows:

1.  The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts. As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.  I am submitting this declaration on behalf of myself and the Center for International Environmental Law (CIEL). I am currently a staff member of CIEL and have been since April of 2014. In my role as the Director of the People, Land, and Resources Program, I focus on promoting transparency; access to information; meaningful participation and robust stakeholder engagement; respect for environmental, social, labor, and human rights standards; and public accountability concerning the activities and policies of the U.S. International Development Finance Corporation (DFC) and its predecessor, the Overseas Private Investment Corporation (OPIC). I have focused on these issues since 2015.

3. CIEL is a 501(c)(3) non-profit, organization with offices in Washington, DC and Geneva, Switzerland. CIEL was established in 1989. Its primary mission is to use the power of law to protect the environment, promote human rights, and ensure a just and sustainable society. CIEL seeks a world where the law reflects the interconnection between humans and the environment, respects the limits of the planet, protects the dignity and equality of each person, and encourages all of earth's inhabitants to live in balance with each other.

4. CIEL began its work with respect to OPIC in the 1990s, as an early active partner in civil society efforts to monitor U.S. bilateral investment programs and enforce environmental and social standards at OPIC.

5. In 2001, following work by CIEL to restrict public financing for persistent organic pollutants (POPs)-promoting projects, CIEL, in cooperation with other NGOs, persuaded OPIC to stop all financing of projects producing or using POPs.

6. CIEL also played a critical role in securing the establishment of OPIC's Accountability Mechanism in 2004, as part of a broader Accountability and Advisory Mechanism (AAM). Since then, CIEL has worked to hold OPIC (and now DFC) accountable to its own policies and procedures and to progressively strengthen those policies and procedures.

7. In 2007, to increase public accountability and participation in OPIC-related decisions, CIEL published a *Citizen's Guide to the Accountability Mechanism of the Overseas Private Investment Corporation (OPIC)*. The toolkit, available at https://www.ciel.org/wp-content/uploads/2015/03/OPIC_Oct2007.pdf, was designed to help give local communities affected by OPIC-supported projects a voice in the development process.

8. In 2010, CIEL engaged actively in the public review process for OPIC's Draft Environmental and Social Policy Statement (ESPS). In extensive comments submitted as part of

that process, CIEL emphasized the critical importance of transparency, public consultation, and disclosure in OPIC's operations.

9. CIEL engaged in stakeholder meetings during OPIC's 2015 review and update of the 2010 ESPS. In 2016 CIEL and partners submitted detailed comments on the revision of OPIC's ESPS listing specific actions and measures that could improve transparency and accountability.

10. Also in 2016, CIEL and co-author organizations published the report *Glass Half Full? The State of Accountability in Development Finance*, which assessed the policies, operations, and impact of accountability mechanisms at development finance institutions worldwide. In Annex 14 to that report, CIEL and partners provided a detailed comparative analysis of OPIC's Office of Accountability, along with key findings and recommendations regarding the need for further improvements in transparency in OPIC's decision-making processes. The report is available at https://www.ciel.org/wp-content/uploads/2016/01/IAM_DEF_WEB.pdf.

11. For many years, CIEL has also supported communities affected by activities financed by OPIC (now DFC) to secure access to information regarding the institution's decision-making processes and to obtain information about OPIC projects and policies, and has attended OPIC Sunshine Act meetings with and on behalf of such partners. For example, in 2008, CIEL supported the Bolivian Indigenous community of Ayllu Jesus de Machaca to file a complaint with OPIC's Office of Accountability concerning displacement and other social and environmental impacts of a silver mine supported by OPIC. This complaint led OPIC to acknowledge in 2009 that it had not applied Involuntary Resettlement and Indigenous Peoples

Policy properly. *See* https://www.ciel.org/news/investigation-finds-that-opic-denied-that-project-affected-community-is-indigenous-did-not-comply-with-its-policies/.

12. Since 2015, CIEL has supported the Coordinadora Ciudadana No Alto Maipo and Chilean organization Ecosistemas representing communities impacted by the construction of the OPIC-financed Alto Maipo Hydroelectric Project.

13. Since 2017, CIEL has supported Argentinian communities concerned about the OPIC-backed Vista Oil & Gas project to develop shale oil in the Bajada del Palo block in Argentina's Vaca Muerta region.

14. Prior to the creation of DFC, I and other CIEL colleagues have for many years taken part in OPIC public hearings, submitted written and oral comments to the institution, and engaged in public discussion regarding projects and policies at OPIC. To do this work, we relied heavily on regular public notice in the Federal Register of upcoming public hearings and information regarding proposed projects and policies to be considered by the OPIC Board at such meetings. With this information, CIEL was able to alert colleagues in countries concerned by current and proposed OPIC activities of potential projects and impacts. In turn, we were able to relay the questions, concerns, and comments of those partners, or of CIEL itself, to the OPIC Board. CIEL was also able to facilitate partners' direct participation in public meetings, so that they could speak on their own behalf, when advance notice of the timing and agenda of such meetings was provided. Such informed participation is in the public interest and contributes to stronger decision-making and avoidance of harm.

15. Below are several examples of OPIC hearings at which CIEL participated:

(a) On June 7, 2017, my CIEL colleague Kelsey Alford Jones presented on OPIC's Alto Maipo Hydroelectric project on behalf of Chilean partners at an OPIC public

|   |   |
|---|---|
|   | hearing. At this hearing, CIEL raised concerns about inadequate due diligence procedures, pending environmental and technical assessments and ensuing environmental and social impacts. CIEL used the opportunity afforded by the hearing to recommend that OPIC avoid refinancing the Chilean project due to community concerns and major opposition to project impacts and potential harm in the region. |
| (b) | At an OPIC public hearing held on September 6, 2017, my CIEL colleague Kelsey Alford Jones again presented on the Alto Maipo Hydroelectric Project on behalf of Chilean partners, to address the critical nature of construction impacts on worker safety and on the surrounding community as the result of deficient due diligence. CIEL provided information about construction problems and the death of a worker that led to a series strikes and cost overruns. CIEL conveyed a direct message from Chilean partners calling for OPIC to reconsider its involvement in the project. OPIC reported on its additional financial support for the Alto Maipo Hydroelectric project in its Annual Report for 2017. |
| (c) | I personally made an intervention at OPIC's quarterly public hearing on June 5, 2019. During the hearing, I conveyed how the construction of the Alto Maipo Hydroelectric Project had impacted the Maipo watershed with damages to farming, tourism, and drinking water supply. I presented information about ongoing worker safety concerns, worker injuries due to landslides and overall concern during project construction. I also communicated the distress of Chilean partners regarding water access and safety in the region. Finally, I requested a timeline for actions in response to OIG USAID's Audit Report *OPIC Investments* |

*Increased Chile's Energy Capacity, but Weak Processes and Internal Controls Diminish OPIC's Ability to Gauge Project Effects and Risks* from February of 2019, which reviewed the Alto Maipo project as part of OPIC's portfolio. CIEL was informed that no action would be taken until the transition to DFC occurred; we relayed this to Chilean partners.

(d) In 2019, my CIEL colleague Steven Feit attended several meetings at OPIC:

  (1) On June 14, 2019, Steven Feit attended a meeting with senior OPIC staff to inquire about their funding priorities and to share our concerns about the impacts of specific OPIC projects and OPIC policies related to fossil fuels and climate. This enabled CIEL to communicate OPIC's intentions to our partners within and without the United States and helped CIEL to build a working relationship with OPIC senior staff.

  (2) On August 26, 2019, Steven Feit, along with Karen Orenstein, representing Friends of the Earth-US (FOE-US), and Maria Marta di Paola representing Argentinean organization Fundación Ambiente y Recursos Naturales (FARN), submitted comments on an environmental and social impact assessment (ESIA) for two proposed hydraulic fracturing ("fracking") projects in Argentina. This resulted in OPIC staff responding to our comments and addressing objections CIEL raised to elements of the ESIA.

  (3) On September 4, 2019, Steven Feit attended OPIC's Quarterly Public Hearing on behalf of CIEL. Karen Orenstein of FOE-US presented a list of concerns with the proposed fracking project in Argentina on behalf of

      FOE-US and CIEL. This had the effect of putting the OPIC board and staff on continued notice of CIEL's ongoing concerns regarding approval of the Vista and Aleph fracking projects in Argentina.

 (4) On September 9, 2019, Karen Orenstein and Steven Feit attended a meeting with David Bohigian, then CEO of OPIC, and other senior OPIC staff, on behalf of the group of organizations (CIEL, FOE-US and FARN) that had submitted comments in opposition to a project to fund fracking in Argentina. CIEL addressed our numerous concerns with the project, its impact on climate change, the environment, and the rights of Indigenous Peoples, and highlighted potential conflicts of interest, with the recommendation that OPIC not fund the project.

 (5) On September 11, 2019, Steven Feit attended the final OPIC board meeting to raise a final objection to the approval of OPIC financing for fracking projects in Argentina.

16. At the end of 2019, DFC succeeded OPIC. Following this change, my colleagues at CIEL and I continued to engage during the OPIC–DFC transition. In early 2020, CIEL and partners expressed concern over the process and contents of the draft Transparency Policy and Board of Directors Public Engagement Policy opened for comment by the DFC. At this time, CIEL reminded DFC of the stipulations of the BUILD Act which required the use of best practices with respect to transparency and environmental and social safeguards while providing extensive comments to the draft transparency policy.

17. On April 13, 2020, without any prior public notice or comment opportunity, DFC announced in the Federal Register the final decision to exempt itself from the open meeting

requirements of the Sunshine Act. Since then, DFC has not held any public meetings of which my CIEL colleagues or I have had notice or in which CIEL representatives have had an opportunity to participate.

18. In the ensuing months, this lack of transparency or opportunity for public engagement with the institution has impaired CIEL's ability to track DFC's monitoring of the Alto Maipo Project in Chile and fracking projects in Argentina, as well as to identify and track decision-making regarding projects under consideration that have significant social, environmental, and human rights impacts. For example, without prior public notice and ability to comment, in September 2020, the DFC Board approved political risk insurance for the Rovuma LNG project in Mozambique—an offshore gas development that threatens to adversely affect local communities, livelihoods, ecosystems, and the global climate—despite mounting political instability and violence in the Cabo Delgado region where the gas buildout is occurring.

19. My CIEL colleagues and I have continued to engage DFC, through meetings with DFC staff on December 15, 2020 and March 31, 2021. At those meetings, we have expressed concern over the need to ensure that best practice and international standards on transparency, participation, and proper stakeholder engagement are incorporated into DFC's policies. In addition to the adoption of environmental and social governance standards at the new institution, CIEL also stressed that DFC's new accountability mechanism should maintain a higher level of transparency and disclosure of information, in line with best practice at other accountability mechanisms.

20. Since the start of 2021, CIEL and partners have provided a series of policy recommendations for the DFC's new accountability mechanism outlining the need for robust commitments on transparency and the disclosure of information about the mechanism's

procedures, operations, and cases. The lack of notice of DFC Board meetings, public access to Board meetings, or minutes and/or transcripts of those Board meetings, hampers our ability to pursue the adoption or implementation of our recommendations and to ensure that those affected by OPIC's operations have access to information about, and opportunities for meaningful participation in, its decision-making.

21. In order to effectively carry out my role at CIEL, I need public notice of upcoming DFC meetings and open access to those meetings and deliberations. I relied on proper notice of and access to OPIC meetings in the past, as mandated by the Sunshine Act. As a consequence of DFC's failure to abide the same law and requirements, I do not know when meetings are happening, and am deprived of an opportunity to provide comments to the Board of DFC and to relay questions on behalf of partners representing communities affected by DFC-supported projects. This limits the dissemination of information to the public, and with it, the institution's accountability both to the taxpayers that finance its activities and to the communities affected by its operations.

22. Having access to information about DFC projects under consideration and approved as well as an opportunity to influence DFC decisions through public hearings enables CIEL to further its mission by holding public institutions accountable to legal standards and policies that protect the environment, promote human rights, and ensure a just and sustainable society.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this  27th  day of May, 2021.

_____
Carla García Zendejas